Case No. 14-1042, United States of America v. Charlie Finley Case not to exceed 15 minutes per side. Mr. LoSavio for the appellant. Thank you, Madam Attorney. Please record I'm Michael LoSavio. I'd like to reserve five minutes for rebuttal. Please proceed. This is a case of Charles Finley. I'm going to represent him subsequently. He's the guilty for the Western District of Michigan. For me, it's a disturbing case. I don't wear kicks. It's disturbing because I'm surprised that somebody with only a high school education like Finley can basically buy the technology and use systems to evade every bit of security we have for electronic commerce. Isn't the internet wonderful? Unbelievable. I'm going back to gold standards. It's the only one. And of course, the weirdness of this is that this virus of conspiracy to defraud the United States somehow got into this case early and just wouldn't die. The core of the issues raised by Mr. Finley before the trial court were that he could not be punished with sophisticated means nor for a leadership enhancement for his activities. There is also an odd colloquy regarding the issue of the number of victims enhancement and how that should be treated by the court. If we could just quickly address the leadership issue. I mean, it seems that there was testimony from several co-conspirators that he was the lead guy. The district court apparently chose to credit that. Really, what basis do we have to revisit that? Mr. Finley does not like to. All right. I think we understand each other now. What's your next? Okay. The, of course, I'm not going to get into the other stuff he said. The sophisticated, sophistication enhancement is troublesome because these encoding cases and Mr. Frank is enlightening further about how they were expanded in exploiting these defects in payment security systems. The question comes up, is Finley a sophisticated criminal? Or is he really a test though, right? It's just simply whether the offense involves sophisticated means. I mean, the precise question is not whether he's a sophisticated criminal. Yes, but I'm going for that sympathy element where, but that does connect to the sophisticated means because can he carry out, does he have the ability to carry them out? But in fact, the real question, as you point out, did he carry out a course of actions which could be sophisticated either in their own right or if collectively, even if they seem to be relatively mundane, collectively shows kind of cleverness and ability to carry out a scheme which both lets him acquire the things he's stealing without violating capture. Let me throw you a lifeline that's attached to a light bulb that probably has some holes in it. Are you familiar with the proposed amendments to the sentencing guidelines that were just announced that go directly to the sophisticated means issue? No, I don't. What, in a nutshell, the Sentencing Commission has apparently done at their meeting on January 9th, so this is new news, which I know about only because Judge Kethledge and I have a case involving the same sophisticated means question tomorrow. So in a 28-J letter which we received last night, along with the government's response last night, so Mr. Frank gets the same question. What both parties point out is yes, they're proposing to change the guidelines in a way that would at least arguably favor your client, but there's no suggestion that these would be made retroactive. And on top of that, you could say, well, we should take that into account. Hard for you to argue that because you're not familiar with it. But Mr. Frank could say, yes, but this discoveries that it meant what the district judge concluded it meant at the time that he applied the enhancement.  All right, thank you. If you want to address that, I'm sure Judge Kethledge doesn't have any objection either if you wanted to send a 28-J in now that you're informed of this and then say, you know, by the middle of next week. Okay, thank you. And I'll incorporate my reference in the letter from that other attorney in that other case. I would suggest that was your best way of proceeding. We don't usually go look for things that are floating around. Maybe you should do your own work on that would be my suggestion. Yes, sir. Well, I mean, on the state of means itself, he codes the blank cards with the credit card information that has been stolen by hackers, I guess, right? And then he goes to one store or his crew, so to speak, will go to a store and they purposely go through the self-checkout lane to buy a gift card. And then they'll often go to a different store. They drove from Detroit to Grand Rapids across jurisdictions, at least federally, to do the scheme. And that's fairly sophisticated stuff. I don't think any of us could easily replicate that, right? No. But what was clear in the plea colloquy, in any of the testimony, is there was no evidence that Finley himself did the card encoding. In this case, in fact, Judge McKee was on the panel in November of 2012, United States v. Lyles and Knight. That was a case also involving the encoding. But there it was established that Lyles had actually done the encoding of the cards. On this one, I wonder whether the terms of the rule – I mean, that's a fair kind of practical point. I just wonder if the terms of the rule are against you on this, because as I recall, the terms of the rule, it asks whether the offense involved sophisticated means. And so, you know, if somebody else is doing the sophisticated stuff and you're part of that conspiracy, then it would seem you might have a problem. Yes. Except here, Finley is – and it's the plea colloquy that makes this clear. He's saying, all I'm doing is essentially producing credit cards illegally. I'm using credit cards without the permission of the cardholder. Without even clarity, he fully understands the difference between a true credit card and a re-encoded card on any particular medium. That wasn't fully expanded upon in the plea colloquy or in the fact discussion. But isn't the problem with that argument that he did admit at his plea proceeding that he knew that other people's credit card information had been coded onto these fraudulent cards? So he's not exactly operating in a vacuum. He didn't do it, but he knew it had been done. And our case law, up to the time that this proposed amendment goes into effect, if it ever does, looks to whether or not the use of sophisticated means was reasonably foreseeable to the specific participant. There's no question that your guy knew what other people had done that enabled him to perform his role. Am I right about that? Yes. So how do you get around that? Well, from his perspective, it's that, you know, I know I'm not a card. It's not a valid card. Of course it has other people's information on it. That instance was done by somebody buying or acquiring large numbers of other people's information and then putting it onto these cards. We don't know that he knows that. All he knows is somebody has sold him or somebody has given him cards which will work. And his own statements, I mean, basically there's four or five lines where he says, What did you do? I took these cards and used them. But is that all that he did? I mean, he participated in stealing the unactivated gift cards and that he did play a role in getting them coded with this false information, did he not? We don't know that. But we do know the fact that he did steal the cards. How did the inactive cards all of a sudden come back? Then he would get the cards. One speculation would be that that was part of the transaction. When he's buying the encoded cards from whoever the supplier is, the supplier is saying, Okay, by the way, I need cash and I need cards that I'm going to give back to you. So if that's far enough into it where he's showing his understanding or knowledge of the process. But you're not claiming that Tooth Fairy showed up one day and encoded these cards in his backpack. He either did it himself or he gave it to somebody else and maybe he paid them to do it, right? Well, that's possible too. Yes, well, that's possible too, but then there's the issue. All I know is he stole these cards. I don't know that those were the ones that were encoded and given back to him. It may have been that the cards were simply part of the other cash he's got to give to the person who is truly encoding the devices, then paying it back to him. Because it wasn't developed, that's why I do not know and the record does not show that he is fully cognizant of what this thing entails. Because all he wants to do is steal. Why do we focus in at all on what he was or was not cognizant of as opposed to what he did? He might have been the dumbest criminal in the world, but employed sophisticated means, notwithstanding his lack of intelligence. Because he, all we know is he employed the card at the Myers checkout counter. That's not sophisticated means in itself. His lack of engagement in the encoding process cuts him off from the truly sophisticated activity. All right, I think we get your argument. So, well, as it is. We conclude by assuming that because you started with the sentencing enhancement issues of the, I think, three or four issues you raised, you felt those to be your strongest claims here. Those were the issues that were raised before the trial court in Duskitt with your de novo law discourse. The issue regarding the victims... I'm not asking you to make the other arguments. I was just asking you why you started with these. And you answered because of the de novo. Yes. Got it. Thank you. You'll have your rebuttal. All right, thank you. Thank you. All right, let's go. Good morning. May it please the court. Assistant Justice Attorney Hagan Frank of the United States. And I'll stay on the topic of sophisticated means since the court seems to be particularly interested in that. First off, I disagree with counsel's assertion that you would get de novo review on the issue of sophisticated means of leadership. I believe that the court made clear in the Kennedy decision that sophisticated means is a factual determination of clear error. It's not reviewed de novo. On leadership, this court recently decided in Washington that that is, while not a purely factual decision, is still one where this court will show exceptional deference to the trial court on both the factual underpinnings and the legal conclusion that those facts add up to leadership. In Washington, this court determined that it was not quote-unquote unreasonable for a district court to apply leadership enhancement. And leadership and sophisticated means, both of those issues in this case are completely intertwined because on the crossroad of the courts we look to whether a particular step in a process was foreseeable to a defendant and whether it was a furtherance of a crime. If so, then that is attributed to the defendant for the purposes of assessing sophistication. And also, as the court knows, obviously in her masters, the focus is not on a particular defendant, his intelligence or how complicated his role in an offense was. The focus is on the overarching scheme and whether that overarching scheme qualifies as sophisticated. I think you're probably correct about today's law on these enhancements. Are you familiar with these proposed guidelines? I was, too, an hour ago. I was completely unaware until five minutes before I walked up here to come to the court. So we're all basically in the same boat. I just happen to have the pieces of paper. So perhaps you take two days to respond to whatever Mr. Lozavio tells us. And really the issue is, I don't think there's any question about whether these are going to bind us or whether they're retroactively effective. The question is should they inform our analysis of this, and if so, in what way? Well, let's assume, as I do, that the proposed change shortens the leash some. It takes some scope and shortens the rope. It constricts what is to be considered sophisticated means. As a general principle, if the Sentencing Commission indicates that this is a clarification as opposed to a change, then yes, I think the court would take it into consideration. But again, speaking as a blank sheet on what they're actually proposing, even if they do restrict it, I think under these facts it would be hard to say that the court is less than restricted. Why don't you talk about that? Under these facts, I think it would be hard to say under even a much more restricted standard that the court was clearly in error for applying sophisticated means because we don't just look at each single step and assess it in isolation and say, well, gee, that looks simple. Next step, gee, that looks simple. We look at the totality, the soup to nuts of the entire scheme. Well, that's what one of the changes appears to be. Look at what the defendant did as opposed to the larger scheme. So if you narrow it even further, I assume you would argue that even what this guy did— Exactly. Right? That's true. Explain that. The only thing that's speculative, the only step in this whole process where there's no evidence indicating that he knew what was going on or the person who participated is the actual initial hacking phase. We don't have any evidence he was involved in that. I'd fall off—I would be extremely surprised if he had anything to do with the hacking because that's typically done by people in Romania or Russia or Vietnam, and that takes real computer smarts. So I don't think he had anything to do with the hacking. But there's evidence in the record showing that he's involved at the next step, the recoding step, and that comes in the form of first off, over at Act 2, which alleges the theft from RIA of the unactivated cards by Charles Finley, Deontay Finley, and Peterson. The act of stealing unactivated cards results in someone having pieces of plastic with a magnetic strip on the back they can't do anything with unless they do something more. So the only conceivable reason to steal unactivated cards is because you want a platform to recode. And that was covered in my proffer at the guilty plea hearing, to which there was no—the defendant didn't object to anything I said in that factional summary. My suggestion to Mr. Lozavio is either he had to recode it himself or he had to pay somebody to do it. Right. Is there any other way it could have happened? No. No, he either had to—I mean, let's put it this way. There's no reason to be stealing those cards unless you want to recode on them. And Peterson told the Secret Service that's why they were in there, stealing those cards, because they were going to recode on them. Now, granted, he did say that it was Deontay Finley who had the recoding connection. But the fact is that, as a matter of logic, there's no reason to steal cards unless you're going to recode. So Peterson said that's why they were stealing those cards. And both Houston and Peterson said that Charles Finley was the source of the cards. So I think there's more than a little bit of evidence in the record to tie him directly to the recoding. If he's not the guy who's actually sitting there with a computer and a reader-scanner device re-encoding the cards, which, by the way, is not all that sophisticated in and of itself either. I mean, this is commercially available software and a commercially available device. So, again, I'll concede that that lone step for coding, this isn't computer genius stuff. But he is, I think, fairly accountable on a personal, individual level for being involved in that second step of the overarching scheme, which is the recoding. But that's the part you just said is not terribly sophisticated. In isolation, no. No, it's not here. So what is it, you know, in addition to that? In addition to that, in addition to that, there's the inter-jurisdictional travel, and not just between federal districts, but across numerous counties, which is often significant in these cases because that's how they avoid any significant punishment. You know, a road trip in a 2008 Pontiac makes it a sophisticated offense. No, no, cross-jurisdictional travel, regardless of what type of car it is. And I'm not going to say that it's sophisticated because cars are complex, and so if you drive from one place to another, that makes it sophisticated. But there's the recoding, and there's the cross-jurisdictional travel for the purpose of coming to West Michigan where they think mistakenly that employees won't be up on their toes for this scheme. Then, once they get to West Michigan, they select the targets, the mires they're going to go to. Then they go into those mires, and they go through the self-checkout phase because they need to make transactions that don't involve face-to-face with store employees. They know they need to do this while being seen by nothing other than a machine because they may need to swipe multiple cards, because they may be using cards, exhausted or recoded store value cards that might say $100 on the front. So if they buy a $750 mire gift card and there's a store employee, they're going to get caught. If the store employee sees the last four digits of a card number on the screen, it's different from the card number they're going to get caught. So they know they have to go through the self-checkout phase. And then a new twist on an old scheme. They don't just buy store value cards. They buy mire gift cards because they can load value onto those at their choosing. It enables them to put a bigger dent quicker in other people's credit accounts. And as the agent said, that's effectively laundering access devices. So they go through the self-checkout lanes, swipe their cards, buy these gift cards, and now they've got genuine, legitimate, fraudulently-obtained mire gift cards that enable them to go make the face-to-face transaction at the electronics counter because you can't buy that stuff through the self-checkout lane. But now they've got a legitimate mire card, and so they can go to the electronics counter and buy the iPad. So beyond encoding, they're then converting the encoded, re-encoded, stolen credit card to a mire's gift card of a very high phenomenon. Yes, and a bunch of them, too. I mean, this scheme was, one day they did $40,000, $50,000, and that means it's lucrative. So they're going through the mire lines, whether at the same store or different stores, really twice. Once in order to get the gift card, and then the second time you go back and use what is now, on its face, a valid gift card to turn that into merchandise. That's correct, your Honor, and they would either go directly— And then I assume they've got to turn the merchandise into cash. Yes, and that's the next step. Now they've got to liquidate that, turn it into cash. And then as Houston and Deontay Finley said, it's Charles Finley who passes out the cash. When this is all done. And, by the way, they don't go through— So he employs different people to turn it into cash? Right, and that's what Sharon A. Poynter said her job was. And how do they actually convert the merchandise to cash? They take it back to Detroit and sell it. This is not the record. I mean, I've had cases where there are stores that do nothing but sell iPods and iPhone electronics that are purchased in this way because they're original in the package. Call the Tenants Department, they're the real deal. But that's—the point of that being that there's yet another step. They now have to turn that into cash. And so, and by the way, they either go directly— Sometimes they would go directly to the electronics counter in the St. Myers store, or they'd go to the next Meyer, which is— You can't drive 10 minutes in West Michigan without going to the Meyer. Now, the only part of this multi-step, cross-jurisdictional scheme involving, in this case, eight other—excuse me, seven other co-defendants, the only part of this whole step that can't fairly be attributed to him is the initial hacking. But the totality of this scheme— And interestingly, the district judge noted something that escaped my attention. It's that on top of all this, sometimes they switch out license plates. To try, on their part, to try and cover their tracks. The district court noted that. It's in the precinct's report, page number 1215. So, this kind of traveling fraud scheme, with all these different steps, I think, even under a standard that looks at what a particular individual did, I think would qualify this defendant. Because this isn't someone who's loathing the conspiracy. This is the leader of the conspiracy. All these steps aren't just foreseeable to him. They're known to him. They're directed by him. He's the guy who says, we're going to go to West Michigan, according to, I think, Houston. We're going to go to West Michigan because, you know, they won't see us coming. So, would it be fair to say that none of these individual steps, in and of themselves, sound to me particularly sophisticated? It's the knowing how to do all of these steps, and then doing them in combination that's the sophistication. Yes, sir. As Master's directs us to look at, we look at the overarching scheme, and it's a whole thing. And some of the steps, I mean, I think it's a pretty neat twist to buy the Meyer gift card, instead of just buying store value cards that might be $100, $200 a pop, to go in and do the Meyer gift cards because you can load, you determine the value that you put on those cards. That was a new twist in these kinds of cases. I'm missing that. You're saying you're determining the value you put on the gift card, but if you buy a predetermined value gift card, aren't you determining how much is on it by virtue of which one you buy? That's right. If you buy the store value cards with the preset values that other banks will issue and such, but the Meyer gift cards, when you go through and you buy them, you get to decide how much is going to be loaded on that card. I'm Charles Finley. I've got your account data on one of my clone credit cards. I'm going to put in, this is $750. I can load it up. I think the limit is $1,000. My question is, how is that different from using this stolen credit card information to go buy a preloaded $750 card? It's just another step because you have to decide how much to load onto it. It's just a new little wrinkle. It lets them use a bigger number. It does. I think the difference is that instead of buying… I thought maybe the answer would be there weren't cards available with a predetermined amount in these large amounts, so they had to go to this route. Is that proper? I think that's correct. I don't think you can go buy the preloaded cards at $750 and typically not giving you $200. Because he is the leader, all of these steps are fully attributable to him on a personal, individual level. However, the rules might be… Assuming the guidelines are straight, and assuming he's right, I don't think that the court would be able to say that a district court is clearly not using a client's sophistication. I've also covered the leadership. The only other thing I would note in the 40 seconds remaining is this argument about the district court having found that they're being errored based on a misnomer about how this was a conspiracy to defraud the United States. What happened there? Was that just a typo? A typo on the face of the pre-sentence report that I didn't notice that made it on the face of the judgment. But throughout every single filing in this case, from the indictment, to the plea agreement, to the report recommendation that said conspiracy to commit wire fraud in 1343 and 1349, to what the district court said when it opened sentencing, saying we're here to sentence for conspiracy to defraud in 1343 and 1349, and the guideline range is 182 years, well over 60 months. Let me ask you a question about this. I'm looking at the J&C, and this question comes up in two different places. There's the title and section. In there, the correct 18 U.S.C. section is cited. Then there's another section of the inquiry book that says nature of the offense, where it's more descriptive. It's in the nature of the offense part of this document, where there is a mistake. When I saw that, I was trying to figure out why anybody really even cares about that. Why is that an error that even needs to be corrected? If it was the reverse, I get it. If the title and section was wrong, that's a problem. But if the descriptive words of what that title and section actually cover is wrong, I'm trying to figure out, and I'm really telegraphing a question to Mr. Losavio so he can think about this as he's going to ask me, why do we even care? I think that's a good question. It's something that occurred to me this morning. In my brief, I said, look, this is a Rule 36 error. We need to fix that. But it occurred to me this morning, this is so minor, it's such an inconsequential misnomer that it has absolutely no potential to confuse anybody about anything related to this case. Why is it even necessary to change it? I mean, this is really a dumb document. Just out of curiosity, knowing that he's raising this, have you ever gone back to have the district judge change it? Because the district judge still retains jurisdiction under the rules for ministerial things, if I remember correctly. I have not. But it's such an inconsequential misnomer that I really don't think anything, I mean, it's this young dog and puppy difference. But the correct statute cited, and at every point of this stage, every stage of this case, everybody knew why they were there, what was at stake, what was being pled to, and what was being satisfied. I think we understand. Thank you, sir. Thank you. Thank you. And Mr. Frank's correct. The two arguments which were presented below to the board to clear our standard, lots of them. Oh, just not in your complaint? Yes. But oral. Wait. The, in reverse order, I will also acknowledge that this issue regarding what that for which he stands a judge guilty caused a great deal of amusement in Mr. Finley's correctional facility. Because the inmate legal aides also didn't give it a whole lot of credit. But then look where their legal judgment has gotten them. The problem with that issue is that, or at least why it's raised, the difference between the sentence he could have given for wire fraud versus that which he could have given for the fraud in the United States is so significant. We know why you're trying to make the effort. Yes. No one would be confused by this, right? Well, the fact that it keeps cropping up, the citation for it appeared in the indictment, albeit none of the wording did. His own counsel, well, actually, it's not just in the pre-sentence report that it pops up. Mr. Finley's sentencing memorandum talks about conspiracy to defraud in the United States. And I'm thinking, no one is talking about this, but why do they keep talking about it when they file something, or why does the judgment say this? Well, if Finley's counsel is the one doing this, this is just invited error. I'm trying to figure out why, if it's correct under the Title I section, why do we even care what it says under the nature of offense? I can't imagine an argument you could make that says that overrides the Title I section. Well, because I thought that would be the case, and so I went back to see if I could find authority. Because this goes into, how do you interpret a judgment? And surely this has come up before, so surely somebody must have said, this is how you look at this, and this is how you fix it. I wasn't lucky in finding that. Now, the oral pronouncement at sentencing was pretty clear. This is wire fraud, and normally that controls. But then it crops up something else. What does that mean, that it crops up something else? No, it crops up. It appears in it, but in the written judgment it says something different. What's the harm, though? I mean, you can spend as much time on this as you want, but you know. It's something which needs to be dealt with. The law does say that if there's a conflict between the oral pronouncement and the written J and C, oral pronouncement controls, right? Yes. And that maybe doesn't work. We can weasel our way all day. But it's just something which should be, I would ask you to address, because I don't want to have to listen. The most honest answer we've got. But on the very interesting point about these proposed amendments, in some ways that, as well as even the current factors, and we would again submit that the facts under even the current section of the guidelines would benefit Mr. Finley, this all kind of harks back to United States v. Kimbrough. What do these guidelines mean? Well, let's focus in on the narrowest possible way we could look at it, because if you can't win that, it doesn't really matter. If the direction the sentencing commission is going is to say you look only at this defendant's actual conduct in connection with this type of an offense, i.e., wire fraud, Mr. Frank makes an argument that he did, I don't know, six, seven, eight things, whatever it was, and he admits none of them individually are that sophisticated. But knowing how to do all of those things and then doing it, particularly as the leader of that very little gang, seems to rise to sophisticated means. What do you say to that? Well, and yes, the law in the Sixth Circuit says that even individually, if they're innocuous together, they can meet that standard, which is where the leadership role and sophistication overlap. That's why he contends that he is not the leader, or if he is even found so under the guidelines, his role in working with them is still relatively minor in terms of control and direction. He still contends there is nothing to show he encoded the cards, all that he acquired these cards from somebody, and then he used them. That's all he said in his plea complaint. So you admit that if we uphold the leadership enhancement, that makes your argument on sophisticated means more difficult to make? Yes. It kills a sophisticated means argument, but as a leader who is coordinating the factors which went into this enterprise, going from Detroit to Grand Rapids, choosing a particular set of devices to use to transfer the money, that would push it more towards sophisticated means as well. We wouldn't want to concede, but they are in a role here. All right. I think we understand. Thank you. We know that you are here, Mr. Sotio, under the Civil Justice Act. We appreciate the service that you've provided to your client and to the court very much. Thank you.